143 Fed.Appx. 976

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,

Tenth Circuit.

William B. DEMPSEY; Eric J. Garcia; Charles W. Hensley, II; Charles R. Woolsoncroft, Plaintiffs–Appellants,

v.

CITY OF BALDWIN, Mayor, City Administrator, and City Council, Defendant–Appellee.

No. 04–3347.
|
Aug. 22, 2005.

**Synopsis**

**Background:** Current and former police officers brought § 1983 action against city, alleging that city engaged in pattern and practice of retaliation against them for exercising their rights under First and Fourteenth Amendments. City moved for summary judgment. The United States District Court for the District of Kansas, Mary H. Murguia, J., 333 F.Supp.2d 1055, granted city's motion, and officers appealed.

**[Holding:]** The Court of Appeals, O'Brien, Circuit Judge, held that city council, rather than mayor, city administrator and police chiefs, was "final policymaker" for city on personnel matters, so that city was not liable under § 1983 for any actions taken against police officers by mayor, city administrator or police chiefs in alleged retaliation for officers' exercise of their free speech and due process rights.

Affirmed.

West Headnotes (3)

**[1]    Civil Rights**  ⚷  Employment Practices

City council, rather than mayor, city administrator and two police chiefs, was "final policymaker" for city on personnel matters, so that city, absent showing that city council had ratified allegedly unlawful retaliatory actions of these other parties or delegated authority to them, was not liable under § 1983 for any actions taken against police officers by mayor, city administrator or police chiefs in alleged retaliation for officers' exercise of their free speech and due process rights; city council had final authority to review any discipline imposed on officers and had not, in fact, accepted discipline imposed by city administrator at mayor's request, but had adjusted discipline as it thought appropriate. 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

EXHIBIT 4

**[2]**    **Civil Rights** 🔑 Employment Practices

City council, as "final policymaker" for city on personnel matters, did not ratify allegedly unlawful actions of mayor and city administrator in purportedly disciplining police officers in retaliation for officers' exercise of their free speech and due process rights, such that city was not liable for these actions under § 1983, given evidence that counsel was composed of independent members, who did not acquiesce in mayor's plans, but fully considered situation and performed meaningful appellate review. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[3]**    **Civil Rights** 🔑 Employment Practices

City council, as "final policymaker" for city on personnel matters, was not shown to have delegated authority to mayor to speak for it as policymaker, such that city was not liable under § 1983 for alleged unlawful acts of mayor in retaliating against police officers for exercising their free speech and due process rights; while mayor made statements regarding his assessment of situation in city's police department, his opinions were his alone, and council disagreed with mayor on certain matters and voted accordingly. 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*977**  Ira Dennis Hawver, Ozawkie, KS, for Plaintiffs–Appellants.

Donald Patterson, Teresa L. Sittenauer, Fisher, Patterson, Sayler & Smith, Topeka, KS, Robert L. Bezek, Jr., Bezek, Lowry and Hendrix, Ottawa, KS, for Defendant–Appellee.

Before TACHA, ANDERSON, and O'BRIEN, Circuit Judges.

**ORDER AND JUDGMENT**[*]

O'BRIEN, United States Circuit Judge.

 **\*\*1**  After examining the briefs and appellate record, this panel has determined unanimously  **\*978**  that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Former and current police officers of the Baldwin City Police Department sued the City of Baldwin, Kansas (the City) and others, alleging the Mayor, as the final policymaker for the City, terminated the employment of two of the officers and caused various adverse employment actions against all of them in violation of the First and Fourteenth Amendments and Kansas state law. The district court granted summary judgment in favor of the City after determining the final policymaker for personnel issues was the City Council, not the Mayor. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

**Background**

In March 2001, Appellants Corporal William Dempsey, Officers Charles Hensley, Eric Garcia and Charles Woolsoncroft (collectively "Appellants") were police officers for the City.[1] At that time, the Baldwin Police Department (the Department)

was comprised of Chief Steve Butell, Sergeant Colleen Larson, the Appellants, Officer Glendon Rhea, Animal Control Officer Tara Craig and School Resource Officer Suzanne Evinger. The City is a "city of the third class"[2] governed by a five member City Council[3] and a Mayor. The City's charter ordinance authorizes the Mayor to appoint three officers: the City Magistrate, the City Attorney and the City Treasurer. The remainder of the City's officers are appointed by the City Administrator who has the authority to fire, with review if requested by the employee, by the City Council. At the time relevant to this lawsuit, the recently-elected Ken Hayes was serving as Mayor,[4] Larry Paine was the City Administrator and Bob Bezek was the City Attorney.

In the fall of 2000, shortly after Woolsoncroft was hired, Garcia, Rhea and Woolsoncroft rented a townhouse together. At some time during October 2000 through March 2001, Garcia and Woolsoncroft witnessed Rhea serving alcohol to underage college students on several occasions. They also observed him arrive home in his car after consuming excessive amounts of alcohol. Woolsoncroft reported these incidents to his immediate supervisor, Cpl. Dempsey, anywhere from one day to one week after the incidents occurred. Dempsey verbally relayed the information to Sgt. Larson and Chief Butell. At some point (Dempsey believes it was in February 2001), Butell told Dempsey to instruct the officers to put their complaints about Rhea in writing.

On March 11–12, 2001, Officers Woolsoncroft, Garcia and Hensley submitted memos to Dempsey, addressed to Chief Butell, regarding their concerns about Rhea's behavior. Woolsoncroft's letter stated that during recent routine patrols, Rhea made statements "of a psychiatric nature" regarding Rhea's paranoia and anxiety attacks. (R. Vol. 3 at 688). Woolsoncroft also reported Rhea appeared angry while at work; an attitude that Woolsoncroft believed raised safety issues for **\*979** the public and other officers while Rhea continued as a police officer. In addition, Woolsoncroft stated he personally observed Rhea engage in various ethical violations such as following a motorist out of his jurisdiction and then falsely reporting he observed a violation within the City's limits. Woolsoncroft renewed his previous accusations regarding Rhea's driving while intoxicated and complained he was taking excessive breaks, causing dissension among the officers and degrading his fellow officers to other officers in the Department and to people in other agencies. Woolsoncroft concluded with his belief that Rhea should be released from his duties because he is "too unpredictable and unreliable to assist any officer at this time." (*Id.* at 696.)

 **\*\*2**  The memos written by Officers Hensley and Garcia reported an incident that occurred after Rhea returned from a call with the county sheriff's office responding to a house alarm. Hensley and Garcia stated that upon Rhea's return to the station, he climbed on top of a dividing wall and acted "pumped up." (*Id.* at 699.) Then, pretending to cradle a shotgun, Rhea stated that after the house was cleared, "he held his shotgun and kissed it" and told the sheriff's officers on the scene "he was making up with his baby because she didn't get to shoot someone like he had promised." (*Id.* at 699.) The officers also expressed their concerns regarding Rhea's work ethic, his demoralizing activities within the Department and their worry for the safety of the officers and the public due to Rhea's mental instability.[5]

After Cpl. Dempsey gave the memos to Sgt. Larson and Chief Butell, Butell and Larson met with Rhea. He generally denied the charges made by his fellow officers but stated he was getting counseling because he was dealing with a divorce, his mother's cancer diagnosis and his father's death. Rhea was scheduled to go on vacation in a few days. Butell told Rhea to take his vacation but instructed him not to return to work until he had a letter from both his counselor and a medical doctor that cleared him for duty as a police officer. Shortly thereafter, Chief Butell and Sgt. Larson met with Woolsoncroft, Garcia and Hensley.[6] Butell explained the actions that had been taken with respect to Rhea. Sgt. Larson also told them that Rhea should be provided the opportunity to correct his behavior, just as they had been given when complaints were made against them.

Nonetheless, the animosity in the Department increased. Some time in May, after Rhea returned with his various medical approvals, Woolsoncroft reported to Cpl. Dempsey that while he was at home one evening he heard Rhea, who was also home on a dinner break, telephone the Douglas County Dispatch with an unauthorized request for a "Triple I"[7] report to **\*980** determine whether the boyfriend of a friend's daughter had a criminal record. Woolsoncroft stated that when confronted with his transgression, Rhea said, "oh, shut up, man. Tell me you wouldn't do it for your friend." (R. Vol. 4 at 1115.) Woolsoncroft reported the incident to Cpl. Dempsey, who went to Rhea's desk and discovered the Triple I report on top of the desk.[8]

On May 18, 2001, Chief Butell issued a memo ordering anyone requesting a Triple I report to notify him, Sgt. Larson or a supervisor of the reason for the request. He warned that a violation of this general order might result in discipline, including suspension. He also admonished that Triple I checks and other reports were not to be left in plain view. No other disciplinary action was taken.

On May 22, 2001, Woolsoncroft again brought forward a complaint about Rhea after learning from a clerk at the Kwik Shop convenience store that Rhea allegedly attempted to purchase beer after hours. Woolsoncroft reported the incident to Dempsey and the clerk also submitted a written complaint. In response, Chief Butell verbally counseled Rhea and issued him a written warning.

 **\*3**  Frustrated by the perceived lack of appropriate response by police administration to Rhea's behavior, some time in May or June 2001, Officer Woolsoncroft and Cpl. Dempsey began communicating with Mayor Hayes and Councilman Wagner regarding their concerns about Rhea and Chief Butell's alleged cavalier response to their complaints. Whether it was Dempsey and Woolsoncroft or the Mayor and Wagner who initiated the conversations is hotly disputed. However, there is no question that Dempsey and Woolsoncroft conveyed their displeasure, including giving both the Mayor and the Councilman a copy of Woolsoncroft's March 12, 2001 memo regarding Rhea's behavior. Meanwhile, the cohesion of the Department continued to deteriorate. Chief Butell and Sgt. Larson felt the other officers were unfairly targeting Rhea. For their part, Appellants felt the administration was not listening to their legitimate concerns.

In late June 2001, Mayor Hayes and Councilman Wagner went to Administrator Paine to advise him of their contacts with Cpl. Dempsey and Officer Woolsoncroft and to determine if Paine was aware of the substance of Appellants' complaints. The next day, Paine and City Attorney Bezek went to Chief Butell and Sgt. Larson for an explanation. Paine told them the Mayor wanted to fire both of them. Both the Chief and the Sergeant were "highly incensed that the communication was occurring [between the elected officials and members of the Department] without their knowledge." (R. Vol. 3 at 955.)

Matters began to roll downhill quickly from there. Butell and Larson isolated themselves from Appellants because they felt they could not be trusted, especially Dempsey. The communication between Appellants, the Mayor and the Council members continued.[9] In addition, Administrator Paine brought Appellants' allegations to the attention of the entire City Council. As a result, the City Council authorized an investigation of the Department by an outside investigator, Mark Bennett,[10] and hired two outside consultants  **\*981**  to address the Department's internal angst.

Toward the end of June, Rhea was involved in a one-car rollover and the sheriff's office allegedly issued him a citation for driving under the influence of alcohol. Shortly thereafter, on July 6, 2001, he submitted his resignation. Unfortunately, Rhea's resignation did not alleviate the situation. Following Rhea's car accident, Appellants' contact with the Council members increased, including contact with some who did not want to be involved. Consequently, on July 9, 2001, at the request of the Mayor, Administrator Paine issued a memo directing the members of the Department to follow the chain of command and to cease going directly to Council members regarding internal police matters. The memo also stated:

> I stated last week there should not be any further contact with City Council members. It is important that you should not be seen with elected officials during this period of time. You know how many sets of eyes there are in the community and folks are taking the opportunity to let me know about those contacts.

>  **\*\*4**  I offer some guidance. If you are approached by an elected official to have a conversation, decline. If necessary, call me to be present.... I am trying to ease tensions on everyone's part. Those who choose to follow a different course will have their own employment options to consider.... Suspension without pay will be the next course in this situation.

> I cannot stress enough that you must let us take care of the issues that have been brought to my attention. I am looking forward to your cooperation. I do not expect less.

(R. Vol. 4 at 1095.)

Bennett took the sworn statements of all Department employees beginning July 27, 2001, and concluding on September 12, 2001. He submitted his report to the City Council on September 24, 2001. His report contained a summary of the sworn statements, a list of documents provided by Chief Butell and Bennett's opinions and recommendations based on the information he received.[11] After exonerating the Department on some of the charges and holding it responsible for others, Bennett concluded:

> In my opinion there is very little if any basis for terminating any of the line officers.... Arguably, there *may* be a basis for terminating Chief Butell.... However, that too is questionable in my mind. Should a decision be made to terminate Chief Butell or should he resign, it would be my very strong recommendation that the new Chief *not* be selected from within the Department. If that were to happen, I believe those remaining officers would see that promotion from within as a signal that they won the battle for control of the Department, making it difficult if not impossible for the Council to exercise supervisory control over the Department.
> (R. Vol. 4 at 1086.) Bennett also strongly recommended that the Council not release any information contained in his report as he understood Rhea was contemplating a lawsuit.

On September 28, 2001, Chief Butell issued a verbal counseling (warning)[12] to Cpl. Dempsey based on two incidents when Dempsey allegedly violated the mandate **\*982** of the July 9, 2001 memo. Butell presented Dempsey with another copy of the memo and informed him that the next violation would be considered insubordiantion and would result in a written reprimand. Dempsey did not appeal the disciplinary action.

At the City Council meeting on October 1, 2001, Appellants' attorney spoke on their behalf to "express [their] concerns about the officer Rhea problem, as well as the hostile work environment and unlawful restrictions on communication with their elected officials." (R. Vol. 4 at 1026.) On October 2, Administrator Paine and Mayor Hayes issued another memo to all City employees regarding the importance of understanding and following the grievance process and the necessity of going through the chain of command before speaking directly to elected officials regarding job issues. The memo concluded by stating, "any employee who bre[a]ches the chain of command and goes directly to an elected official, will be immediately referred to the City Administrator and Department Head for resolution of the issue." (R. Vol. 2 at 557.)

 **\*\*5** On October 5, 2001, Administrator Paine, Mayor Hayes and Councilman McCrary met with Chief Butell and Sgt. Larson regarding the grievance process. After the meeting, Paine prepared a memo summarizing the substance of the discussion. The memo was distributed to Appellants, the City Council, Hayes, Butell and Larson. It expressed support for Chief Butell and Sgt. Larson and encouraged "all members of the department [to] begin to work together again and rebuild the trust factor among all personnel." (*Id.* at 559.)

Unfortunately, cooperation was not to be had. At the November 19, 2001 City Council meeting, an issue was raised by Councilman Wagner regarding the Department's internal communication of police reports. It appears Wagner learned of this issue in the form of complaints made directly to him without first informing Sgt. Larson or Chief Butell. As a result, Chief Butell called a staff meeting and verbally counseled the entire Department.

Having had time to consider the Bennett Report, the City Council, at its December 3, 2001 executive session directed Administrator Paine to issue notices of disciplinary action to Butell, Larson and Appellants.[13] According to Mayor Hayes, the notices were issued for the purpose of allowing the **\*983** individuals in the Department to respond to the Bennett Report. Each notice stated that the City intended "to waive the provision for having a Grievance Committee as outlined in Article H–2 paragraph 2" and that "[b]y requesting an appeal, [each would] agree that a Grievance Committee is not appropriate and that appeal to the whole Council is proper." (R. Vol. 2 at 579.)

On December 11, 2001, all recipients of the disciplinary notices replied by filing a single request for an appeal before a neutral Grievance Committee. By letter dated December 18, 2001, Administrator Paine denied the request. He explained the City's rules required the Grievance Committee to be comprised of a supervisor/department head, the City Administrator and a third non-supervisory employee chosen by the two. Although the rules did not specifically address situations where the City Administrator

Case 5:26-cv-01302-SLP    Document 8-4    Filed 07/22/26    Page 6 of 12

was the person imposing the discipline, Paine believed his presence on the Committee might taint the decision. He concluded that the step should be eliminated. Instead, the matter should proceed directly to the City Council. In response, the Department requested Paine recuse himself and appoint a non-biased member such as a judge. If that was not possible, the members of the Department wanted to appeal "as a whole department and not as individuals." (R. Vol. 3 at 681.) On December 28, 2001, Paine denied the request and scheduled a time for each individual to present his case to the Council in executive session prior to the general January 7, 2002 City Council meeting.

On January 5, 2002, Mayor Hayes called Cpl. Dempsey regarding a dangerous road condition. Without Hayes' knowledge, Dempsey tape-recorded the conversation. After discussing the road condition, Mayor Hayes asked Dempsey, "How you doing man?" (R. Vol. 2 at 581.) When Dempsey replied that he was doing "OK, [ ] considering," Hayes launched into an attempt to explain the disciplinary action from his point of view. (*Id.*) Basically, he explained that his major goal was to get rid of Chief Butell, but some Council members would not allow the Chief to be disciplined without considering the actions of the rest of the Department. He stated, "[t]he decision [ ] who got handed what, was not mine and not mine alone.... [T]he, ah, end all of what occurred as far as who got disciplined, who didn't, was a 'political decision.' " (*Id.* at 582.) Mayor Hayes also stated he was going to push to have the Bennett Report published so the public can understand "what the [h]ell this is all about." (*Id.* at 585.)

 **\*\*6**  According to Paine, Dempsey told him of the existence of the transcript prior to the January 7 Council meeting. Dempsey told Paine the transcript was "damaging to the [M]ayor and all I want is this stuff to go away." (R. Vol. 3 at 969.) Dempsey asked Paine to inform the Council about the tape "so that, you know, we can just go on and live our lives." (*Id.*) However, Paine did not know the actual substance of the conversation until the transcript was published in the Baldwin newspaper in March 2002. Dempsey does not deny he went to Paine before the meeting, but contends he told Paine the transcript would be published to give Paine a "heads up to do the right thing and show the mayor was lying!" (R. Vol. 5 at 1491.)

On January 7, 2002, the Department's disciplined members appeared before the City Council in executive session. The Council then conducted its regular meeting and afterward returned to executive session to discuss the disciplinary appeals. The Council met again two days later to finalize its unanimous decisions.[14] Letters informing each officer of the result of his  **\*984**  or her appeal were issued on January 10, 2002. Officer Garcia's discipline was decreased from a one-day suspension to a written reprimand. The one-day suspensions without pay were upheld for Officer Woolsoncroft and Cpl. Dempsey. Chief Butell's three-day suspension without pay was also upheld. Sgt. Larson's initial oral reprimand was increased to a one-day suspension without pay, while Officer Hensley was completely exonerated and the notice of discipline removed from his files.

The City Council's final decision, however, did not heal the distressed Department. The activity surrounding the Department understandably caused a great deal of public interest accompanied by local news coverage. Believing the Mayor was unfairly portraying them in the news, Cpl. Dempsey made the transcript of his telephone conversation with the Mayor available to the local newspaper. The transcript was printed on March 27, 2002. Also, on March 6, 2002, Chief Butell placed Woolsoncroft on six months probation following several complaints regarding his conduct. Woolsoncroft appealed and the decision was upheld by Administrator Paine on March 16, 2002. On March 12, 2002, Appellants' attorney sent letters to the city clerk pursuant to "KSA 12–105b" stating claims for "unlawful job action[s] ... in violation of tort law regarding 'whistle blowing' [and] for violation of ... constitutional rights under the First and Fourteenth Amendments." (R. Vol. 4 at 1024.)

In late June or early July 2002, Paine discovered Chief Butell had removed disciplinary documents from Woolsoncroft's file prior to a visit from a representative of the Shawnee Police Department regarding Woolsoncroft's potential employment. When Paine discovered the file had been cleansed, he telephoned the Shawnee City Manager and told him Woolsoncroft's file was incomplete when reviewed and a complete file would be made available for a second review. No one returned to view the complete file and Woolsoncroft was not offered the position. Chief Butell resigned upon Paine's request in July 2002.

 **\*\*7**  After Chief Butell resigned, Sgt. Larson became Acting Chief. On October 15, 2002, Acting Chief Larson gave Woolsoncroft a notice of intent to terminate his employment which set forth in detail the reasons for doing so. Woolsoncroft

appealed the decision to Paine and then to the City Council. The decision to terminate his employment was affirmed by the City Council on October 23, 2002.

On December 16, 2002, Michael McKenna, who had retired from the Wichita Police Department, was sworn in as Chief of the Baldwin City Police Department and began his official duties on January 2, 2003. On May 18, 2003, Chief McKenna ran background checks on all police department employees and two applicants for a secretary position. The report returned on Cpl. Dempsey revealed the existence of a felony conviction in California in 1964. As a result, McKenna issued Dempsey a notice of formal disciplinary action on June 10, 2003. The notice informed Dempsey that he was immediately suspended with pay and that his prior conviction was cause for termination. On July 9, 2003, Dempsey received a letter of termination and his police officer's certification was revoked by the Kansas Law Enforcement Commission. Dempsey appealed and a Grievance Committee upheld the decision. He filed an appeal to the City Council but later withdrew his appeal and, instead, issued a letter of resignation on July 21, 2003. After he withdrew his appeal, Dempsey presented evidence that his conviction had been reduced to a misdemeanor on September 29, 2003, and the Kansas Law Enforcement Committee reinstated his police officer's certificate on March 3, 2004.[15]

## *985  Procedural Background

On January 7, 2003, Appellants filed a complaint in the United States District Court for the District of Kansas against the City, Mayor Hayes, Administrator Paine and the City Council for actions primarily taken by Hayes, and to a lesser extent, Paine, Butell and McKenna. Appellants claimed a violation of their constitutional rights under the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. In addition, they stated a claim under Kansas law for defamation. On February 19, 2003, Appellants filed a First Amended Complaint with essentially the same allegations. On August 28, 2003, Appellants moved to amend their First Amended Complaint to include a claim that they had been subjected to continuing work-related retaliation, specifically noting the termination notice to Cpl. Dempsey. The motion was granted and on September 23, 2003, Appellants filed their Second Amended Complaint including an allegation of a pattern and practice of retaliation and intentional infliction of emotional distress. During the pretrial conference, Appellants stipulated to the dismissal with prejudice of all claims against Mayor Hayes, Administrator Paine and the City Council, leaving the City as the only remaining defendant. They also dropped the intentional infliction of emotional distress claims.

The City filed a motion for summary judgment and supporting brief on December 16, 2003, arguing that the offending parties were not the final policymakers and claiming Appellants' speech was not protected under the First Amendment. Following the Appellants' response, including the extensive affidavits of Dempsey, Garcia and Woolsoncroft, the district court granted summary judgment in favor of the City on August 17, 2004. The district court determined that the City Council was the final policymaker for the purposes of personnel decisions, and therefore the City could not be held liable for the actions of the Mayor or other City employees. The district court further declined to exercise supplemental jurisdiction over Appellants' state law claims.[16] This timely appeal followed.

## Standard of Review

**8  "We review the grant of summary judgment de novo, applying the same standard as the district court." *PETA, People for the Ethical Treatment of Animals v. Rasmussen,* 298 F.3d 1198, 1203 (10th Cir.2002). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In cases involving the First Amendment, the de novo standard is appropriate ... for the further reason that ... [i]n cases raising First Amendment issues ... an appellate court has an obligation to make an independent examination of the whole record

in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Horstkoetter v. Dep't of Pub. Safety,* 159 F.3d 1265, 1270 (10th Cir.1998) (quotations omitted).

**Discussion**

A government entity may not be held liable under 42 U.S.C. § 1983 by way of the respondeat superior doctrine. *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *City of St. Louis v.* **\*986** *Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). To obtain a judgment against the City, Appellants must prove that the municipality itself supported the violation of rights alleged. *Monell,* 436 U.S. at 692–95, 98 S.Ct. 2018; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Section 1983 liability attaches to a municipality only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. The question of who is a "policymaker" is a question of state law. *Praprotnik,* 485 U.S. at 124, 108 S.Ct. 915. In looking to state law, a court must determine which official has final, unreviewable discretion to make a decision or take an action. *Id.* at 127, 108 S.Ct. 915.

To determine the identity of the final policymaker, we consider whether: 1) the official is meaningfully constrained by policies made by another; 2) the official's decisions are subject to meaningful review; and 3) the decisions are within the realm of the official's authority. *Randle v. City of Aurora,* 69 F.3d 441, 448 (10th Cir.1995). Liability will be imposed on a government entity for the actions of an official who is subject to review by other policymakers or who is limited by the policy and decisions of others only if the final policymaker ratifies the decision of the subordinate. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915. The final policymaker must not only approve the decision, but also adopt the basis for the decision, and the ratification must be the moving force, or cause, of the alleged constitutional violation. *Paprotnik,* 480 U.S. at 127, 107 S.Ct. 1038 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *David v. City & County of Denver,* 101 F.3d 1344, 1358 (10th Cir.1996). With these principles in mind, we begin with a review of the controlling law.

*State Law*

**\*\*9** The following statutes apply to cities of the third class.

Kan. Stat. Ann. § 15–301 provides:

The mayor shall preside at all meetings of the city council, and shall have a casting vote when the council is equally divided, and none other, and shall have general supervision over the affairs of the city. The mayor shall be active and vigilant in enforcing all laws and ordinances for the government of the City, and he or she shall cause all subordinate officers to be dealt with promptly for any neglect or violation of duty.

Kan. Stat. Ann. § 15–204 provides in relevant part:

The mayor, with the consent of the council, may appoint ... the following city officers: A municipal judge of the municipal court, a clerk, a treasurer, a marshal-chief of police, law enforcement officers and such other officers as deemed necessary.... The duties and pay of the various officers shall be regulated by ordinance. Any officer may be removed by a majority vote of the total membership elected or appointed to the council and may be suspended at any time by the mayor.

*City Rules and Regulations*

Article A–3 of the City's Uniform Personnel Rules and Regulations authorize the head of each city department to adopt written rules and regulations for the operation of the department, so long as the regulations do not conflict with the City's. Articles G–1 and G–2 authorize department heads to discipline employees for, *inter alia,* violating the City's rules, the department's regulations or for engaging in general misconduct. Pursuant to Article G–3, discipline may involve a verbal **\*987** warning

(referred to in the Department as verbal counseling), a written reprimand, probation, salary reduction, demotion, suspension or termination of employment. However, Article G–4 requires any discipline more severe than a verbal warning to be approved by the City Administrator.

Article H sets out the City's grievance procedure and Article G–4(g) requires an employee to be notified of his or her right to file a grievance at the time discipline is implemented. Article H–1 states that "[a]ny employee has the right to present a complaint or grievance concerning his or her job, working conditions, salary, relationship between employees and co-workers, supervisor, or departmental head...." (R. Vol. 2 at 509.) This article also provides that "[a] sincere attempt should be made by each employee and supervisor to resolve any grievance before it becomes necessary to resort to the grievance procedure." (*Id.*) Article H–2 requires the initial grievance to be filed with the employee's supervisor. If the employee disagrees with the supervisor's decision, he may forward a written complaint to the department head. If the employee's supervisor is the department head, the grievance may be forwarded to the City Administrator. If the grievance is not resolved to the employee's satisfaction, the employee may file a complaint with the City Administrator and it will be heard by a three-person Grievance Committee comprised of the City Administrator, a supervisor or department head appointed by the Mayor and a non-supervisory employee. If the employee remains dissatisfied with the Grievance Committee's decision, he may appeal directly to the City Council, whose decision is final.

### Police Department Policies

**\*\*10** Section 2.035 notes:

It shall be the duty of all supervisors and employees to take corrective action and/or promptly submit a written report to the Chief through channels whenever they, through personal observation or report, learn of any violation of the rules and regulations, personnel rules, and/or the laws of the State of Kansas or the United States.

(R. Vol. 2 at 513.) Section 2.105 requires an employee having knowledge of any criminal act or activity to immediately report the information to the appropriate division or supervisor at the Department. Section 2.030 states that disciplinary action under the Department's policies will be in accordance with the City's Uniform Personnel Rules and Regulations.

### Final Policymaker

In the district court, Appellants' constitutional claims were directed toward the actions of Mayor Hayes, Administrator Paine, Chief Butell and Chief McKenna. The district court found that the City Council was the final policymaker on personnel decisions for the City. Because neither Hayes, Paine, Butell or McKenna had final policymaking authority for the personnel matters at issue, the district court concluded the City could not be held liable for their actions and, as a result, granted summary judgment in favor of the City. On appeal, Appellants argue they submitted sufficient evidence demonstrating Mayor Hayes was the final policymaker.[17] Specifically, they argue Mayor Hayes "bargained away" their rights in order to remove Chief Butell. (Appellants' Br. at 48.)[18] In the alternative Appellants contend **\*988** that, even if the Mayor is not a final policymaker under Kansas law, the Council's acquiescence to the Mayor's position rendered the City liable for the Mayor's unwarranted discipline of the officers in retaliation for stepping forward about Officer Rhea's activities and the lack of response by Chief Butell and Sgt. Larson.

 **[1]**    In support of their argument that Mayor Hayes was the City's final policymaker regarding the officers' discipline, they cite to *Meade v. Grubbs,* 841 F.2d 1512 (10th Cir.1988), *Wulf v. City of Wichita,* 883 F.2d 842 (10th Cir.1989), and *Flanagan v. Munger,* 890 F.2d 1557 (10th Cir.1989). In *Meade,* the plaintiff claimed the county commissioners were liable for the alleged negligent hiring, training and supervision of the Sheriff's deputies. 841 F.2d at 1519. We refused to hold the county responsible, recognizing that under Oklahoma law, the sheriff had the sole responsibility for such duties and was therefore the final policymaker. *Id.* at 1528. *Meade* does not help Appellants. Here, the controlling law is found in the Kansas statutes and the City of Baldwin's rules and regulations, not Oklahoma law. The City's rules and regulations give the Council the *final* authority to review all personnel disciplinary decisions. Thus, even if the Mayor had the authority to cause Appellants to be "dealt with promptly" under Kan. Stat. Ann. § 15–301, the Council had the final say in *how* they would be dealt with.

**\*\*11**  *Wulf* and *Flanagan* are similarly unpersuasive. In *Wulf,* a police officer sued the city based on his termination by the police chief and the city manager. 883 F.2d at 846. We determined that the city manager, not the police chief, was the final policymaker in employment matters. *Id.* at 868. We reasoned, absent "official copies of the City Charter or the relevant ordinances or procedure manuals for the City," the evidence demonstrated that the city manager "is the only person with any claim of having 'final policymaking authority' over employment decisions." *Id.* We then held the City was not liable because the city manager (as opposed to the police chief) did not violate the police officer's constitutional rights.

Appellants claim *Wulf* is similar to the facts in this case because the city manager's decision was subject to a grievance procedure before "the City Personnel Advisory Board (the 'Board'), composed of four private citizens and one City employee." *Id.* at 854. However, Appellants fail to note in *Wulf,* after the Board concurred with the termination, "[the city manager] concurred with the Board's report and findings, and sustained Wulf's termination." *Id.* In other words, "[t]he Board's opinion [was] merely advisory, and the [c]ity [m]anager need not accept it." *Id.* at 854–55 n. 17. Unlike *Wulf,* the record contains the City's policies clearly identifying the Council as the *final* authority in personnel matters.

In *Flanagan,* two police officers sued the city and police chief for, *inter alia,* violating their First Amendment rights in issuing written reprimands based on their part ownership in a video store that stocked sexually explicit videos. 890 F.2d at 1561. We rejected the city's argument that it meaningfully reviewed written reprimands given by the police chief. *Id.* at 1568–69. Our decision was based on the city's admission that it had delegated its authority to the police chief to set policy regarding discipline imposed on officers for violations of department rules and therefore, "for all intents and purposes the  **\*989**  Chief's discipline decisions [were] final, and any meaningful administrative review [was] illusory." *Id.* at 1569. Here, we find no evidence that the City Council delegated its authority to the Mayor and no evidence that the Council's review was "illusory." Instead, the facts clearly demonstrate the Mayor did not control the Council. The Council did not accept the discipline imposed by Administrator Paine at the request of the Mayor nor did it terminate Chief Butell—the Mayor's ultimate goal. Indeed, it exonerated Officer Hensley, decreased the discipline for Officer Garcia, and increased the discipline for Sgt. Larson. Despite the Appellants' perception of the Mayor's political control, it is clear he did not hold such sway with the Council members.

 **[2]**   Turning to the claim that the Council ratified the Mayor's unlawful activity, Appellants primarily rely on the taped telephone conversation between Dempsey and Mayor Hayes on January 5, 2002. They contend the conversation "proves ... Mayor Hayes was a final policy maker acting as a driving force causing other officials to support adverse employment actions [against Appellants]." (Appellants' Br. at 42.) The transcript reveals Mayor Hayes explained to Dempsey that to get Chief Butell removed, he had to agree to discipline everyone involved. He also told Dempsey he wanted to merely issue written reprimands to Appellants and Larson, but suspend Butell for five days. However, Hayes reported that when he discussed the issue with Council members, at least three members said that if Hayes wanted to suspend Butell, he had to suspend all of the officers. Hayes also said:

>  **\*\*12**  And it looks like, and I understand where you guys are coming from, from my position, it looks like I am just laying fire down on the whole organization but, in order to get the leader out, I gotta bring fire on all of you.

(R. Vol. 2 at 586.)

Further, Appellants claim the following statements are explicit proof that the disciplinary action was an agreed upon bargain between Hayes and the Council:

> Because, if, and I tried it once, if I single him out, the Chief, for disciplinary action, and I have no support as far as two members and the swing vote....

(*Id.*) and

> I'm sure you guys feel like I've betrayed you and that I, you know, that I've not acted in your best interest. Ah, that's not the case, the ah, end all of what occurred as far as who got disciplined, who didn't, was a political decision.

(*Id.* at 582).

Appellants conclude the Mayor's admission that the disciplinary action was "a political decision," coupled with the Council's knowledge of the First and Fourteenth Amendment violations as explained by their attorney at the October meeting, establish the Council's ratification of the Mayor's "plan to remove Chief Butell in exchange for Mayor Hayes' disciplining of [Appellants] for speaking out on a matter of public concern." (Appellants' Br. at 43.) The most glaring problem with this argument is the fact that the Council did not remove Chief Butell, nor did it completely concur with Paine's disciplinary decisions. What the conversation does reveal is a mayor with his own agenda and a council composed of independent members who did not acquiesce to the Mayor's plans. Rather, the Council fully considered the situation and performed a meaningful appellate review of the personnel decisions.

**[3]** Finally, Appellants maintain the Council allowed the Mayor to speak for it as a policymaker and therefore, the City is liable for the Mayor's actions. This claim **\*990** is based on several news articles published between November 2001 and March 2002 in which the Mayor made statements regarding his assessment of the Department situation and his belief that the Bennett Report should be made public. A careful review reveals the Mayor's opinions were his alone. In fact, the Council disagreed with his position on the publication of the Bennett Report and voted accordingly. There is no evidence in the record that the Council delegated the Mayor as its spokesperson.

## Conclusion

In sum, Appellants failed to establish any material fact demonstrating the relinquishment of the Council's clear authority to independently and finally review city officials' personnel decisions. While Appellants' revelations raised quite a stir in the small town of Baldwin and created a political issue embraced and manipulated by the Mayor, the record contains nothing to indicate the Council did not carefully and independently consider Appellants' appeals of the disciplinary actions taken against them. Accordingly, we agree with the district court that the City Council is the final policymaker for the City's personnel actions and AFFIRM summary judgment in favor of the City.

## All Citations

143 Fed.Appx. 976, 2005 WL 2002512

Footnotes

\*       This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

1       Appellants began their employment with the Baldwin Police Department on the following dates: Dempsey, April 15, 1996; Garcia, March 13–14,1999; Hensley, July 13, 1999; and Woolsoncroft, August 21, 2000.

2       Kan. Stat. Ann. § 15–101 defines a "city of the third class" as a town with no more than 2,000 residents.

3       At the time of the events leading to Appellants' lawsuit, the Council members were George McCrary, Ken Wagner, Ed Cohen, Marilyn Pearse and J.R. Brecheisen.

4       Mayor Hayes was elected in April 2001, and took office in May 2001.

5       In addition to voicing complaints about concern for the safety of the public and other officers, the letters contained complaints about Rhea's attitude that he was better than the other officers, his efforts to be called to assist the county sheriff's officers and his rudeness to his fellow officers during the time he was appointed Officer in Charge, a position directly under Cpl. Dempsey.

6       Cpl. Dempsey was not at the meeting because he had expressed a feeling of being uncomfortably caught in the middle of the situation.

7    The Interstate Identification Index, otherwise known as "Triple I," is part of a computerized information system that allows law enforcement to check an individual's criminal history. The Baldwin Police Department ran all Triple I requests through the Douglas County Sheriff's Office which, in turn, was connected to the computers at the Kansas Highway Patrol. The use of the system is strictly limited to criminal investigations.

8    A later investigation of Rhea's use of the Triple I system by the Kansas Highway Patrol and the Kansas Bureau of Investigation resulted in the Department's loss of authorization to use the system for one month.

9    Officer Garcia stated his communications with elected officials concerned only the condition of the Department's vehicles.

10    Bennett, an attorney from Topeka, was hired based on his previous engagement by the Shawnee County Jail to investigate the conditions at that facility.

11    Copies of the sworn statements and the documents were attached to the report.

12    A verbal warning is the first level of disciplinary action and is the only action that can be taken without consulting the City Administrator.

13    Chief Butell received notice of a three-day suspension without pay. Sgt. Larson was given notice of an oral reprimand.

As to Officer Woolsoncroft, the notice charged him with: failure to file a grievance with the City Administrator; failure to follow the chain of command in spite of written directives to do so; failure to report the consumption of alcohol by a minor in his presence and at his residence; failure to inform the Chief in a timely manner of a crime committed by a fellow officer; failure to cooperate by providing the names of persons alleging drug use by an officer; and poor judgment in securing a written statement from an alleged battery victim. Officer Garcia was also charged with failure to file a grievance; failure to follow the chain of command; discussing with third parties internal police matters that are not of public concern without informing the Chief; failure to report the consumption of alcohol by a minor; and failure to report the criminal activities of a fellow officer in a timely manner. Both officers were suspended one day without pay. Cpl. Dempsey was charged with: failure to file a grievance; independently initiating investigations without notifying or informing the Chief; discussing internal police matters not of public concern with elected officials without informing the Chief; and continuing to go outside the chain of command after being directed to follow procedures. He, too, was suspended for one day without pay. Officer Hensley was given an oral reprimand for failing to follow the chain of command to resolve grievances.

14    Because the vote of the Council was unanimous, Hayes did not vote because his authority to vote only arose in the event of a tie.

15    Sgt. Larson voluntarily resigned from the Department on January 21, 2003. Officers Garcia and Hensley were still employed with the Department at the time this appeal was fully briefed.

16    Appellants have not appealed this determination.

17    Except for vague inferences in their reply brief, Appellants do not argue that Paine, Butell or McKenna are final policymakers for the City.

18    Appellants argue the district court erred in failing to consider the entirety of their submitted affidavits. After a review of the affidavits, we find they are irrelevant as to whether the City Council ratified the actions of the Mayor or was aware of the alleged misrepresentations of the Mayor, the Administrator, or the various chiefs. Therefore, the admission of the affidavits in their entirety would not affect our decision and we need not reach the issue.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.