2020 WL 2813526
Only the Westlaw citation is currently available.
United States District Court, W.D. Oklahoma.

Wendy CARSKADON, individually, and as Administrator of the Estate of Amanda Lynnette Freeman, Deceased, Plaintiff,
v.
ARMOR CORRECTIONAL HEALTH SERVICES, INC., et al., Defendants.

Case No. CIV-18-1013-G
|
Signed 05/29/2020

**Attorneys and Law Firms**

John A. Krahl, Kevin E. Krahl, Rand C. Eddy, Mulinix Goerke & Meyer PLLC, Oklahoma City, OK, for Plaintiff.

Austin J. Young, Sean P. Snider, Johnson Hanan & Vosler, Oklahoma City, OK, for Defendants Armor Correctional Health Services Inc., Jerry Childs, Jr.

Carri A. Remillard, District Attorney's Ofc., Oklahoma City, OK, for Defendants Board of County Commissioners of Oklahoma County, John Whetsel.

**ORDER**

CHARLES B. GOODWIN, United States District Judge

***1** Now before the Court are the following motions: (1) Motion to Dismiss Amended Complaint, filed by Defendants Board of County Commissioners of Oklahoma County and Sheriff P.D. Taylor (Doc. No. 24);[1] (2) Defendant Armor Correctional Health Services, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint (Doc. No. 25); and (3) Motion to Dismiss Plaintiff's Amended Complaint filed by Defendant Jerry Childs Jr., DO (Doc. No. 28). Plaintiff has responded in opposition to each Motion (Doc. Nos. 30, 31, 32), and Defendants have replied (Doc. Nos. 34, 35, 36). After considering the parties' arguments and the governing law, the Court determines that the Motions should be granted.

Summary of the Pleadings

*A. Plaintiff's Allegations*

Amanda Lynnette Freeman died on February 11, 2017, while in pretrial custody at the Oklahoma County Detention Center ("OCDC"). Am. Compl. ¶¶ 2, 29. Ms. Freeman was booked into the OCDC on or about February 7, 2017, after she was arrested and charged with possession of a controlled dangerous substance and drug paraphernalia. *Id.* ¶¶ 11, 12. "At the time of [her] arrest and/or her booking into the [OCDC]," Ms. Freeman "informed officials that she had recently taken a large amount of methamphetamine," that "she was presently undergoing methadone treatment, and that she had medical issues with drug withdrawal, including seizures." *Id.* ¶ 12.[2]

At approximately 5:20 a.m. on February 10, 2017, Linda Jackson—a registered nurse employed by Defendant Armor Correctional Health Services, Inc.—was summoned to Ms. Freeman's cell, where she found Ms. Freeman "kicking and flailing

EXHIBIT 1

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

her arms and shouting 'NAAAAAA' with every breath and foaming at the mouth." *Id.* ¶ 13. Prior to administering medical care, Nurse Jackson "attempted to perform an exorcism" on Ms. Freeman. *Id.* ¶ 15. With assistance from "five or so" correctional officers, Nurse Jackson put Ms. Freeman on a gurney and transported her to the facility's medical clinic, where she arrived at approximately 5:45 a.m. *Id.* ¶¶ 14, 16.

Upon arriving at the medical clinic, Nurse Jackson called a psychiatric nurse practitioner, who referred her to Defendant Jerry Childs Jr., DO ("Dr. Childs"). *Id.* ¶ 16. Nurse Jackson called Dr. Childs, who instructed her to administer 10 mg of Haldol and 2 mg of Ativan to Ms. Freeman. *Id.* At approximately 6:02 a.m., Nurse Jackson administered the medications as instructed by Dr. Childs. *Id.* ¶ 17.

Nurse Jackson observed "no noticeable change" in Ms. Freeman. Another nurse contacted Dr. Childs at approximately 6:45 a.m. *Id.* ¶ 19. Dr. Childs ordered that Ms. Freeman be given an additional 2 mg of Ativan. *Id.*

***2** At approximately 7:42 a.m., a third nurse reported that Ms. Freeman appeared "to be under the influence of an intoxicating substance." *Id.* ¶ 20. The report indicated that Ms. Freeman had an elevated heart rate (137 beats per minute), that she was "handcuffed and chained to the gurney" with "a hood placed over her head," and that she "smelled of urine." *Id.*

Dr. Childs examined Ms. Freeman at approximately 10:49 a.m. *Id.* ¶ 21. He noted that she was "calm," exhibited no signs of distress, and that—while she was "not responding to voice"—she was able to move all extremities. *Id.* Concluding that her condition was a "probable drug intox," Dr. Childs "placed [Ms. Freeman] on 23-hour observation, ordering vital signs be taken every 4 hours." *Id.*

Ms. Freeman was returned to her cell and "advised to return to medical if [her] condition worsen[ed]" or in the event of an emergency. *Id.* ¶ 22 (first alteration in original). Her vital signs, as recorded at 10:55 a.m. and 2:47 p.m., reflected an elevated heart rate. *Id.* ¶¶ 23-24. Ms. Freeman's last recorded vital signs were taken at 11:26 p.m. *Id.* ¶ 25.[3]

At approximately 4:49 a.m. on February 11, 2017, Ms. Freeman was "found unresponsive lying on a bunk" in her cell. *Id.* ¶ 26. A nurse "ran for assistance and then returned to [Ms. Freeman's] cell" to administer CPR. *Id.* "An automated external defibrillator ("AED") was applied as well as an artificial manual breathing unit bag ("AMBU bag") with oxygen." *Id.* CPR was continued until emergency medical responders arrived at approximately 5:00 a.m. *Id.* On arrival, the responders noted that Ms. Freeman was "pulseless, apneic and unresponsive," as well as "rigored, specifically in her jaw and neck." *Id.* ¶ 27. She was pronounced dead "at 5:00:14 a.m." *Id.* ¶ 29.

*B. Plaintiff's Claims*

Plaintiff Wendy Carskadon, Ms. Freeman's mother, brought suit in this Court pursuant to 42 U.S.C. § 1983, asserting claims both on behalf of herself and—in her capacity as administrator of Ms. Freeman's estate (the "Estate")—on behalf of the Estate. Plaintiff names as defendants: Dr. Childs; the Board of County Commissioners for Oklahoma County (the "Board"); P.D. Taylor, in his official capacity as Sheriff of Oklahoma County ("Sheriff");[4] and Armor Correctional Health Services, Inc. ("Armor"), a Florida-based company that provided medical care to Ms. Freeman pursuant to an Inmate Care Services Agreement executed and subsequently renewed by the Board. *Id.* ¶¶ 3-6, 37, 48.

Plaintiff alleges on her own behalf a claim against each Defendant for deprivation of her "liberty interest in the parent-child relationship in violation of her substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution." *Id.* ¶¶ 64, 79, 93, 108. On behalf of the Estate, Plaintiff asserts that Defendants violated Ms. Freeman's rights under the Eighth and Fourteenth Amendments to the U.S. Constitution. *Id.* ¶¶ 51-109. Plaintiff contends that each of the Defendants was "deliberately indifferent to the serious medical needs of [Ms. Freeman] by failing to summon or provide [Ms. Freeman] with appropriate medical care, and/or take other measures to prevent her death after noticing her need for medical


© 2024 Thomson Reuters. No claim to original U.S. Government Works.

attention." *Id.* ¶¶ 64, 79, 93, 108. Plaintiff additionally alleges that Ms. Freeman was subjected to unconstitutional conditions of confinement at OCDC. *See id.* ¶¶ 30-36, 70, 84.

Analysis

***3** Defendants move to dismiss Plaintiff's individual § 1983 claims for deprivation of her parent-child relationship on the basis that she lacks standing. The Board also moves to dismiss all claims brought on behalf of the Estate for lack of subject-matter jurisdiction. Finally, Defendants move to dismiss Plaintiff's constitutional claims for failure to state a claim upon which relief may be granted.

*A. Standing*

Certain of the Defendants contend that Plaintiff lacks standing to assert, on her own behalf, a claim for deprivation of her liberty interest in the parent-child relationship in violation of her substantive due process rights. *See, e.g.*, Def. Armor Mot. (Doc. No. 25) at 10-11 (citing *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) ("[A] section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else.")). In her responses to the Motions, Plaintiff states that she withdraws that claim. *See* Pl.'s Resp. to Defs. Bd./Sheriff Mot. (Doc. No. 30) at 2-3; Pl.'s Resp. to Def. Armor Mot. (Doc. No. 31) at 4 (stating that Plaintiff brings this suit only as "administrator of Freeman's estate and not as next of kin"); Pl.'s Resp. to Def. Childs Mot. at 4 (stating that Plaintiff brings this action as "duly appointed administrator of the estate"). There being no objection to the relief sought, the Motions are granted as to this issue. The docket shall be updated to reflect that Plaintiff is not proceeding "individually," and Plaintiff's claims for deprivation of her liberty interest in the parent-child relationship (*see* Am. Compl. ¶¶ 64, 79, 93, 108) shall be dismissed without prejudice.

*B. Subject-Matter Jurisdiction*

1. <u>Applicable Standard</u>

A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction takes one of two forms: a facial attack or a factual attack. *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015). Here, the Board attempts to raise a facial attack by questioning the sufficiency of Plaintiff's allegations to establish the Court's subject-matter jurisdiction over Plaintiff's constitutional claims. *See id.*; Defs. Bd./Sheriff Mot. (Doc. No. 24) at 14-20. In reviewing a facial attack, a district court must accept the allegations in the complaint as true. *See Pueblo of Jemez*, 790 F.3d at 1148 n.4.

2. <u>Discussion</u>

First, the Board asserts that, because it "has no express statutory authority to act in operating the [OCDC]," the injury alleged is not "traceable to the [Board's] acts or omissions." Defs. Bd./Sheriff Mot. at 15-16 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (noting that one element required to establish constitutional standing is "a causal connection between the injury and the conduct complained of")). This argument "conflates the justiciability of a plaintiff's lawsuit with the plaintiff's ultimate ability to prove a defendant's liability in that lawsuit." *Cramer v. Okla. Cty. Bd. of Cty. Comm'rs*, No. CIV-18-179-G, 2019 WL 1937602, at *5-6 (W.D. Okla. May 1, 2019); *cf. Kauble v. Bd. of Cty. Comm'rs of Cty. of Okla.*, No. CIV-17-729-D, 2018 WL 912285, at *3 (W.D. Okla. Feb. 15, 2018) ("While couched in terms of subject matter jurisdiction, this argument, in reality, is premised on the notion that Plaintiff has failed to state a claim upon which relief can be granted because the BOCC has no authority to act in areas of detaining or releasing inmates.").

***4** "Under Oklahoma law, a county's board of county commissioners is not a separate legal entity from the county"; rather, "it *exercises* the powers of the county." *Snow v. Bd. of Cty. Comm'rs of Cty. of McClain*, No. CIV-14-911-HE, 2014 WL 7335319, at *2 (W.D. Okla. Dec. 19, 2014). More to the point, "[a] suit brought against a county's board of county commissioners is the way Oklahoma law contemplates suing the county." *Id.* (citing Okla. Stat. tit. 19, § 4). In this case, Plaintiff has alleged that Oklahoma County, through the Board, contracted with Armor for the provision of allegedly substandard medical care to inmates at the OCDC. *See* Am. Compl. ¶¶ 3, 37, 48; *see also id.* Exs. 1, 2 (Doc. Nos. 20-1, 20-2). This allegation is sufficient to establish an "injury" that is "fairly traceable to the challenged action of" the Board and to establish Plaintiff's standing to bring her § 1983 claims against the Board. *Defenders of Wildlife*, 504 U.S. at 560 (alteration, omission, and internal quotation marks omitted); *see Vernon v. Slabosky*, No. CIV-11-815-HE, 2016 WL 4775739, at *14 (W.D. Okla. Sept. 14, 2016) ("The United States Supreme Court has made it clear that any official or entity whose actions represent official policy may be liable under § 1983."); *see also Defenders of Wildlife*, 504 U.S. at 561 (explaining that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing). Accordingly, the Board's request to dismiss Plaintiff's claims under Rule 12(b)(1) shall be denied.[5]

Second, the Board argues that the claims against it should be dismissed because asserting claims against both the Board and the Sheriff in his official capacity is redundant and unnecessary. *See* Defs. Bd./Sheriff Mot. at 21-22. The Board states that bringing suit "against the [Board]" and bringing suit against "a county official in his or her official capacity" "are simply different ways to bring suit against a county." *Id.* at 21.

The Court agrees that the referenced claims are duplicative. The Court, however, finds that dismissal of the claims against the Sheriff is appropriate. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (stating that bringing "a claim against [a sheriff] in his official capacity ... is the same as bringing a suit against the county"); *Espinosa Hernandez v. Bd. of Cty. Comm'rs of Okla. Cty.*, CIV-18-606-R, 2019 WL 3069430, at *6 (W.D. Okla. July 12, 2019) (finding that "the official capacity claim against [the sheriff] is a claim against Oklahoma County, and therefore is redundant" to claims brought against the Board); *Powell*, 2019 WL 2238022, at *4 (dismissing official-capacity claims against the sheriff regarding conditions at OCDC, rather than claims against the Board, as redundant). All claims against Sheriff Taylor in his official capacity shall be dismissed without prejudice.

### *C. Failure to State a Claim*

#### 1. Applicable Standard

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may seek dismissal when the plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In analyzing a motion to dismiss under Rule 12(b)(6), the Court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). A complaint fails to state a claim on which relief may be granted when it lacks factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) ("[T]o withstand a motion to dismiss, a complaint must contain enough allegations of fact to state a claim that is plausible on its face." (internal quotation marks omitted)). Bare legal conclusions in a complaint are not entitled to the assumption of truth; "they must be supported by factual allegations" to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

#### 2. Deliberate Indifference to Serious Medical Need

***5** Plaintiff asserts that all Defendants were deliberately indifferent to Ms. Freeman's serious medical needs in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. *See* Am. Compl. ¶¶ 51-109. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States" and "must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Ms. Freeman was a pretrial detainee. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). However, "[t]he constitutional protection against deliberate indifference to a pretrial detainee's serious medical condition springs from the Fourteenth Amendment's Due Process Clause." *Burke v. Regalado*, 935 F.3d 960, 991 (10th Cir. 2019); *accord Van Curen v. McClain Cty. Bd. of Cty. Comm'rs*, 4 F. App'x 554, 556 (10th Cir. 2001). "In evaluating such Fourteenth Amendment claims, 'we apply an analysis identical to that applied in Eighth Amendment cases.' " *Burke*, 935 F.3d at 991 (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999)).

The "deliberate indifference standard has objective and subjective components." *Id.* at 992 (alterations and internal quotation marks omitted). To establish the objective prong, Plaintiff must show "that the deprivation at issue was 'sufficiently serious.' " *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834 (1994)). "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotation marks omitted).

To establish the subjective component of the deliberate-indifference standard, Plaintiff must allege sufficient facts to demonstrate that the defendant in question knew of and disregarded "an excessive risk to inmate health or safety." *Id.* The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." *Id.* (alteration and internal quotation marks omitted). The Tenth Circuit has explained that "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

> [W]here a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted ....
>
> ... Indeed, our subjective inquiry is limited to consideration of the doctor's knowledge at the time he prescribed treatment for the symptoms presented, not to the ultimate treatment necessary.

*Id.* at 1232-33.

Defendants argue that Plaintiff fails to plead facts sufficient to plausibly support a claim of deliberate indifference. Because the Court concludes that Plaintiff has not satisfied her pleading burden with respect to the subjective component, the Court need not decide whether Plaintiff's allegations satisfy the objective component of her claim—i.e., that Ms. Freeman's medical condition was "sufficiently serious."

Plaintiff's allegations, taken as true, establish that Ms. Freeman was rushed to the OCDC's medical clinic within minutes of being found in a state of distress. *See* Am. Compl. ¶¶ 13-16. Dr. Childs was consulted and medications were administered. *Id.* ¶¶ 16-19. Ms. Freeman was subsequently examined by Dr. Childs, who diagnosed her with "probable drug intox," assessed that her condition had stabilized, and ordered that she be placed under medical observation. *Id.* ¶ 21. When Ms. Freeman was later "found unresponsive" in her cell, emergency care was administered in the form of CPR, as well as application of an AED and AMBU bag. *Id.* ¶ 26. Defendants argue, and the Court agrees, that these events demonstrate that Ms. Freeman "received a consistent course of treatment," including "examinations, diagnoses, and medication," and, therefore, preclude a reasonable inference that Defendants acted with deliberate indifference to Ms. Freeman's medical needs. *Debrow v. Kaiser*, 42 F. App'x 269, 269 (10th Cir. 2002); *see also Self*, 439 F.3d at 1232-33.

***6** Plaintiff argues that Dr. Childs and Armor employees failed to properly treat Ms. Freeman's medical condition. *See* Pl.'s Resp. to Def. Childs Mot. at 7; Pl.'s Resp. to Def. Armor Mot. at 8. Specifically, she contends: (1) that Ms. Freeman was

treated in-house with "emergency ... doses of antipsychotic and sedative medications" instead of being "referr[ed] to a higher level of care"; (2) that Dr. Childs "did not physically observe [Ms. Freeman] until approximately five hours after the event, at which point he diagnosed a 'probable drug intox,' and ordered [Ms. Freeman] to be placed on 23-hour observation and her vital signs to be taken every 4 hours"; (3) that Nurse Jackson "attempted an exorcism"; and (4) that Armor employees "deliberately disregarded" Ms. Freeman's apparent seizure and elevated heart rate. Pl.'s Resp. to Def. Childs Mot. at 7-9; Pl.'s Resp. to Def. Armor Mot. at 8-10. Each argument is considered in turn.

*a. In-House Treatment*

Plaintiff's contention that Ms. Freeman should have been referred by Dr. Childs to a higher level of care amounts to a mere "difference of opinion with medical staff," which is insufficient to establish deliberate indifference as a matter of law. *Toler v. Troutt*, 631 F. App'x 545, 547 (10th Cir. 2015). Whether Ms. Freeman's condition warranted treatment by a specialist or other provider of "higher" care was a question of medical judgment entrusted to Dr. Childs, and Plaintiff has not, as she must, shown that Dr. Childs exhibited an "extraordinary degree of neglect" in deciding to treat Ms. Freeman himself. *Self*, 439 F.3d at 1232; *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) (explaining that prescribing medication and referring a patient to a specialist are generally matters of medical judgment that do not give rise to a § 1983 claim). Indeed, Plaintiff does not contend that Dr. Childs was unqualified to treat Ms. Freeman, that he misdiagnosed her condition, or that the medications or treatment he prescribed for her were inappropriate under the circumstances.

*b. Delay in Physical Examination by Dr. Childs*

Similarly, Plaintiff's opinion that Dr. Childs should have examined Ms. Freeman sooner is insufficient, without more, to plausibly state a claim of deliberate indifference.

A delay in medical care can form the basis of an Eighth Amendment violation "where the plaintiff can show that the delay resulted in substantial harm." *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000). But in this case, Plaintiff's allegations do not reflect that Ms. Freeman experienced a delay in treatment. By Plaintiff's own account, Ms. Freeman was rushed to the OCDC's medical clinic, where, in the hours immediately following her medical episode, she was treated and monitored by a staff of nurses under the direct supervision of Dr. Childs. *See* Am. Compl. ¶¶ 13-20. Plaintiff, rather, alleges only that Ms. Freeman experienced delay with respect to a particular form of treatment: physical examination by a doctor.

A delay in being seen by a physician, as opposed to other medical staff, does not in and of itself constitute an Eighth Amendment violation. "[T]here is no *per se* requirement that a jail provide its inmates around-the-clock access to a medical doctor." *Boyett v. Cty. of Wash.*, 282 F. App'x 667, 673 (10th Cir. 2008).

> While jailers are ultimately responsible for their inmates' medical needs, they can provide that care in a variety of ways, including access to trained personnel such as guards in the first instance, nurses, and physicians' assistants. The Eighth Amendment requires nothing more as a general matter. While access to a medical doctor may be necessary in certain situations, no constitutional violation occurs unless medical care is intentionally or recklessly denied.

*Id.* (citations omitted). Even in serious medical situations, an inmate's initial evaluation and treatment by prison nursing staff may be consistent with the Eighth Amendment. *See, e.g., Vargas v. Corr. Healthcare Mgmt. of Okla., Inc.*, No. CIV-06-498-F, 2007 WL 1432051, at *1, *4 (W.D. Okla. May 14, 2007) (holding that defendant was entitled to summary judgment on inmate's Eighth Amendment claim based on delay in medical treatment of his bullet wound where inmate was initially examined and administered medications by an on-staff nurse and provided "further evaluation and medical treatment" by a doctor the following day); *Watson v. Corr. Corp. of Am.*, No. CV-14-454-RAW-SPS, 2018 WL 1474895, at *6-8 (E.D. Okla. Mar. 26, 2018) (holding that inmate failed to establish an Eighth Amendment violation based on delay in medical care where the record showed that he was immediately examined and treated by prison nursing staff and subsequently "placed in a medical cell

for further examination by a doctor later in the day”). Plaintiff has not alleged facts that would support an inference that the treatment provided Ms. Freeman—including immediate examination by nursing staff, telephone consultation by nursing staff with a physician, provision of medication as directed by the physician, subsequent examination by the nursing staff and the physician, and continued monitoring—was intentionally or recklessly denied, or otherwise deficient to such a degree as would allow a deliberate-indifference claim.

*c. Attempted Exorcism*

***7** Plaintiff does not contend that the exorcism allegedly attempted by Nurse Jackson directly harmed Ms. Freeman. Thus, the only apparent relevance of this event in the context of Plaintiff's Eighth Amendment claim lies in the possibility that it delayed the administration of medical care. Plaintiff pleads no facts, however, that would allow a reasonable inference that any delay occasioned by the alleged exorcism caused Ms. Freeman's death or any other “substantial harm.” *Sealock*, 218 F.3d at 1210. Indeed, Plaintiff alleges that Ms. Freeman arrived at the medical clinic approximately 25 minutes after Nurse Jackson was summoned to her cell, where she was sedated and remained in a stable condition for several hours. *See* Am. Compl. ¶¶ 13-16.

*d. Disregard for Ms. Freeman's Condition Due to Armor's Conflict of Interest*

Plaintiff's final complaint—that Armor employees “deliberately disregarded” Ms. Freeman's apparent seizure and elevated heart rate due to a conflict of interest—is impermissibly conclusory. Plaintiff alleges that the Inmate Care Services Agreement created “a contractual incentive” for Armor, as well as Dr. Childs, “to keep [Ms. Freeman's] treatment in-house at [the OCDC] rather than transporting her to a higher level of care for evaluation and treatment” and that all Defendants knew about this incentive. Am. Compl. ¶¶ 49-50; *see also id.* ¶¶ 40-47.

This allegation is belied by Plaintiff's own factual allegations that the on-staff medical team responded to Ms. Freeman's condition by rushing her to the OCDC's medical clinic, consulting with Dr. Childs, administering medications as directed, and placing Ms. Freeman under medical observation. *See id.* ¶¶ 13-21. By Plaintiff's own account, Armor employees “took relatively prompt action” in response to Ms. Freeman's condition, which is not indicative of deliberate indifference and does not show a culpable state of mind. *Rose v. Beckham*, 82 F. App'x 662, 665 (10th Cir. 2003). Accordingly, Plaintiff has failed to state a claim upon which relief can be granted with regard to denial of adequate medical care.

3. <u>General Conditions of Confinement</u>

In addition to the claims based on inadequate medical care, Plaintiff appears to allege Defendants Board and Sheriff subjected Ms. Freeman to unconstitutional conditions of confinement. *See* Am. Compl. ¶¶ 30-36, 70, 84. In this regard, Plaintiff alleges that Defendants were aware of a 2008 report issued by the Department of Justice “outlining ... constitutional deficiencies” at the OCDC (the “DOJ Report”), including, as relevant here, “failure to meet detainees' serious medical needs,” “inadequate[ ] screening [of] detainees for serious medical problems,” and “failure to provide appropriate access to medical care during emergencies.” *Id.* ¶¶ 30-31, 36. Plaintiff further alleges that Defendants were aware of a 2009 Memorandum of Understanding (“MOU”) between the United States and Oklahoma County “set[ting] forth several actions to be taken by Oklahoma County ... to meet its constitutional obligations. *Id.* ¶¶ 33, 36.

Defendant Board moves to dismiss this claim on the basis that: (1) reliance on the DOJ Report is “too remote, too speculative, and too conclusory” with respect to injuries alleged to have occurred in 2017; and, (2) Plaintiff “fails to allege any specific facts that either connect the allegedly unconstitutional conditions with [Ms. Freeman's] own experiences or indicate how the conditions caused” the alleged injuries. Defs. Bd./Sheriff Mot. at 27-28.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). "Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (citation omitted); *see also Farmer*, 511 U.S. at 832 ("[I]t is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." (internal citation omitted)).

***8** Pursuant to the Eighth Amendment, "[jail] officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). In order to hold officials liable for violating Ms. Freeman's right to humane conditions of confinement, two requirements must be met:

> First, the deprivation alleged must be objectively "sufficiently serious," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), depriving the inmate of " 'the minimal civilized measure of life's necessities,' " *id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Second, the official must have a "sufficiently culpable state of mind," which in this context means the official must exhibit "deliberate indifference" to a substantial risk of serious harm to an inmate. *Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 297 ..... [A] prison official is liable only if the "official knows of and disregards an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. It is not enough to establish that the official should have known of the risk of harm.

*Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) (citations omitted).

Here, even assuming the truth of Plaintiff's allegations, she has not stated a plausible claim that any jail official "kn[ew] of and disregard[ed] an excessive risk" to Ms. Freeman's "health or safety." *Farmer*, 511 U.S. at 837. Based on this finding, the Court need not address whether Plaintiff's allegations satisfy the objective component.

Plaintiff alleges no unconstitutional condition of confinement affecting Ms. Freeman other than the medical events of February 2017. The pleading states no facts demonstrating Ms. Freeman was subjected to any other risk to her health or safety, including any of the deficiencies outlined in the DOJ Report or MOU. Therefore, any claims based solely on the issues described in the DOJ Report or MOU are speculative, conclusory, and insufficient to state a claim upon which relief can be granted. With regard to Ms. Freeman's medical needs at OCDC, as discussed above Plaintiff pleads insufficient facts to demonstrate deliberate indifference. For these reasons, Plaintiff's claims based on unconstitutional conditions of confinement must be dismissed under Rule 12(b)(6).

### *D. Leave to Amend*

Contained within Plaintiff's response briefs is a request for leave to amend her pleading should the Court find the claims deficient. *See* Pl.'s Resp. to Defs. Bd./Sheriff Mot. at 13; Pl.'s Resp. to Def. Armor Mot. at 14; Pl.'s Resp. to Def. Childs Mot. at 10.

None of the Defendants objected to this request in their reply briefs. And district courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "The purpose of the Rule is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (internal quotation marks omitted). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) (internal quotation marks omitted).

***9** This Court's local rules, however, direct that a party seeking leaving to amend under Rule 15(a)(2) must file a motion for leave to amend, stating whether any party objects and "attach[ing] the proposed pleading as an exhibit to the motion." LCvR 15.1. Plaintiff did not comply with this Rule and has not explained what changes she proposes to make. She therefore has not shown that amendment would cure the deficiencies cited by Defendants. The Court denies the request for leave to amend but does so without prejudice to Plaintiff submitting a motion for leave to amend that complies with Local Civil Rule 15.1.

CONCLUSION

For the foregoing reasons, the Motions to Dismiss filed by Defendants Board of County Commissioners of Oklahoma County, Sheriff P.D. Taylor, Armor Correctional Health Services, Inc., and Jerry Childs Jr., DO (Doc. Nos. 24, 25, 28) are GRANTED. Plaintiff's Amended Complaint (Doc. No. 20) is DISMISSED WITHOUT PREJUDICE. Plaintiff may submit a motion for leave to file a second amended complaint within 14 days of the date of this Order. Absent the filing of such a motion, judgment shall be entered for Defendants.

IT IS SO ORDERED this 29th day of May, 2020.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 2813526

Footnotes

1 The Amended Complaint raises claims against John Whetsel, the prior Sheriff of Oklahoma County, in his official capacity. *See* Am. Compl. (Doc. No. 20) at 1. P.D. Taylor, the current Sheriff, is hereby substituted as Defendant on these official-capacity claims pursuant to Federal Rule of Civil Procedure 25(d).

2 In her Response to Dr. Childs' Motion, Plaintiff explains that she is presently unaware of the individual(s) to whom Ms. Freeman gave this information. *See* Pl.'s Resp. to Def. Childs Mot. (Doc. No. 32) at 8-9.

3 It is unclear from the Amended Complaint whether Plaintiff's vital signs were taken between 2:47 p.m. and 11:26 p.m. and, if so, whether Plaintiff's heart rate was elevated during that period. It is not stated whether Plaintiff's heart rate was elevated when recorded at 11:26 p.m.

4 *See supra* note 1.

5 Although the Court has considered this argument as presented—under Rule 12(b)(1)—it would likewise be rejected if considered as a request for dismissal for failure to state a claim under Rule 12(b)(6). *See* *Powell v. Bd. of Cty. Comm'rs of Okla. Cty.*, No. CIV-18-294-D, 2019 WL 2238022, at *3-4 (W.D. Okla. May 23, 2019).

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.